UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CRYSTAL LOWE,

    Plaintiff,                                              Civil Action No. 21-CV-10709

vs.                                                      HON. BERNARD A. FRIEDMAN

CITY OF DETROIT,

    Defendant.
_____/

**<u>OPINION AND ORDER GRANTING PLAINTIFF'S
MOTION FOR A PRELIMINARY INJUNCTION</u>**

This matter is presently before the Court on plaintiff's motion for a preliminary injunction [docket entry 4]. Defendant has responded and plaintiff has replied. An amicus brief has also been filed by a coalition of individuals and entities that oppose plaintiff's motion.[1] On May 27, 2021, the Court heard oral argument. As explained more fully below, the Court shall grant plaintiff's motion for a preliminary injunction because the city ordinance governing the process for obtaining a recreational marijuana retail license gives an unfair, irrational, and likely unconstitutional advantage to long-term Detroit residents over all other applicants.

Plaintiff challenges the recreational marijuana licensing ordinance (the "Ordinance") adopted by the City of Detroit ("the City") under both the United States and Michigan constitutions. The allegedly unconstitutional provisions of the Ordinance grant preferential treatment to "Detroit

---

[1] The amici include the following individuals and entities: Beyond Equity, LLC; Cannaclusive, LLC; Chicago NOORML; Green Believers, LLC; The Hood Incubator, LLC; Jessica Jackson; Shauntay Williams; Kourtney Ketterhagen; Ronald Bartell; Tiff Massey; Mitzi Ruddock; and Jonathan Ray. *See* PageID.524.

legacy" applicants (i.e., those who have lived in Detroit for at least ten years) for the following recreational marijuana licenses: "adult-use retailers, adult-use processors, adult-use growers, designated consumption establishments, microbusinesses, and marijuana event organizers."[2] Ordinance §§ 20-6-2, 20-6-31(d), 20-6-35. Plaintiff, who does not qualify as a Detroit legacy applicant, intends to apply for an adult-use marijuana retail license and argues that the challenged provisions (1) violate her right to equal protection under the Michigan Constitution; (2) punish her for exercising her fundamental right to inter- and intrastate travel, as guaranteed by the Michigan Constitution; and (3) violate the dormant Commerce Clause of the United States Constitution. *See* Compl. ¶¶ 11, 50-58.

This case was commenced in Wayne County Circuit Court on March 2, 2021, and was removed to this Court on March 30, 2021. The City of Detroit was scheduled to begin accepting recreational marijuana license applications on April 1, 2021. *See* Ordinance § 20-6-36(c). However, plaintiff filed a motion for a temporary restraining order and preliminary injunction on April 1, 2021, requesting that the Court temporarily halt Detroit's recreational marijuana licensing process until plaintiff's constitutional challenges are resolved. *See* docket entry 4. The Court held a hearing on April 7, 2021, at the conclusion of which the Court granted plaintiff's motion for a temporary restraining order and established a briefing and oral argument schedule for the motion for a preliminary injunction. *See* docket entry 9.

In the instant motion, plaintiff argues that the Ordinance's Detroit legacy licensure provisions (described in further detail below) give an unfair preference to long-time Detroit residents – individuals who have lived in the City for at least 10-15 of the past 30 years. While applicants

---

[2] Each of these different licenses is defined in § 20-6-2 of the Ordinance.

who have lived in Detroit for at least 15 of the past 30 years automatically qualify for legacy status, applicants who have resided in the City for 10-14 of the past 30 years must meet additional conditions to qualify – i.e., be low-income, have a marijuana-related criminal record, or have a parent with a marijuana-related criminal record.³  As to the parent-drug-offense condition, the offense must have occurred while the applicant was a minor.  The licensure scheme provides a six-week early application period exclusively for legacy applicants, during which time the City may accept, review, and approve legacy applications prior to non-legacy applications.  The Ordinance also reserves at least fifty percent of all relevant recreational marijuana licenses for legacy applicants.  *See* Ordinance § 20-6-31(d).  Some of the licenses are further limited by numerical caps.  For example, recreational marijuana adult-use retail licenses are capped at 75 licenses.

Plaintiff is 33 years old and has lived in Detroit for 11 of the past 30 years.  Prior to moving to Detroit, she lived in River Rouge, a bordering community, and spent time living out of state, "including with her then-husband while he was on military duty."  Pl.'s Br. at 9.  Although plaintiff's mother was charged with a marijuana-related offense in 2007, plaintiff was above the age of eighteen at that time.  *See id*. at 2.  Plaintiff therefore does not qualify as a Detroit legacy applicant.

I.     **The Ordinance**

The stated purpose of the Ordinance is "to promote equitable ownership and employment opportunities in the cannabis industry in order to decrease disparities in life outcomes

---

³ The Ordinance uses the term "prior controlled substance record," which it defines as someone who has "been convicted, or adjudged to be a ward of the juvenile court, for any crime relating to the sale, possession, use, cultivation, processing, or transport of marijuana prior to November 7, 2018."  Ordinance § 20-6-2.

3

for marginalized communities and to address the disproportionate impacts of the War on Drugs in those communities." *Id.* at 5-6 (quoting Pl.'s Ex. C (Mem. from Brenda Jones, Council President)). To this end, the City developed a licensure application process that prioritizes Detroit legacy applicants. *See id*. at 6. This prioritized class of applicants includes the following:

> [A]n individual who has, or an entity that is at least 51% owned and controlled by one or more individuals who have, as certified by the Civil Rights, Inclusion, and [O]pportunity Department, been a City of Detroit resident at the time of application for at least one year, and upon renewal, and additionally has been:
>
> > (1) a City of Detroit resident for 15 of the past 30 years preceding the date of application, and continues to so reside throughout the period of licensure; or
> >
> > (2) a City of Detroit resident for 13 of the past 30 years preceding the date of application, and continues to so reside throughout the period of licensure, and is a low income applicant at the time of application, as defined in this Section; or
> >
> > (3) a City of Detroit resident for the 10 of the past 30 years preceding the date of application, and continues to so reside throughout the period of licensure, and has a prior controlled substance record, as defined in this section, or a parent with a prior controlled substance record as defined in this section under the following circumstances:
> >
> > > (i) the parent is named on the applicant's birth certificate, and the parent's conviction took place before the applicant's 18th birthday; or
> > >
> > > (ii) the parent has claimed the applicant as a dependent regularly on federal income tax filings, and the parent's conviction took place before the applicant's 18th birthday.

*Id*. at 6-7 (quoting Ordinance § 20-6-2). "The Ordinance imposes a 75-license cap on the number of available adult-use marijuana retailer licenses" and mandates that at least fifty percent of those

licenses be awarded to Detroit legacy applicants.[4] *Id*. at 7. Further, plaintiff notes that

> [t]o facilitate its preference for "Detroit legacy applicants," the Ordinance provides that applications for adult-use marijuana establishment licenses shall be submitted from April 1, 2021 to April 30, 2021. "From May 1, 2021 through June 15, 2021 there will be a reserved review period wherein the City will review and may approve applications for adult-use marihuana establishment licenses from Detroit legacy applicants[.]" . . . After [the] reserved review periods have ended, "the City will review and may approve applicants for adult-use marihuana establishment licenses from any applicant."

*Id*. at 7-8 (quoting Ordinance § 20-6-35) (citations omitted). As of the filing of plaintiff's motion for a preliminary injunction, the City of Detroit had certified over 400 legacy applicants. *See id.* at 8. That is to say, as of April 1, 2021, the City had determined that 400 applicants were entitled to the legacy preference.

Because of the tiered approach to application submission and review, and because it is unclear whether any licenses are reserved for non-legacy applicants, the 400 certified Detroit legacy applicants could be awarded all 75 recreational marijuana retail licenses. Even if half of the licenses are reserved for non-legacy applicants, plaintiff contends that it would be unconstitutional to categorically bar such applicants, including herself, from eligibility for half of the 75 total licenses. *See* Pl.'s Reply Br. at 1, 6.

---

[4] The number of licenses that must or may be issued to legacy applicants is unclear. When this suit was filed, the Ordinance stated that "[n]o less than 50% of licenses" would be awarded to legacy applicants. Ordinance §§ 20-6-31(d), 20-6-35(f). This language, combined with the six-week early application and review period for legacy applicants, allows for the possibility that at least 50% and perhaps 100% of the licenses could be awarded to legacy applicants. Defendant attached an amended version of the Ordinance as an exhibit to its answer to plaintiff's complaint, in which the phrase "[n]o less than" is deleted, thus mandating a 50:50 ratio between legacy and non-legacy licensees. *See* Def.'s Ex. 2. Nonetheless, on the City of Detroit website, the Ordinance still includes the "[n]o less than" language. *See* https://detroitmi.gov/sites/detroitmi.localhost/files/2020-11/11-17-2020%20%20Adult-Use%20Marihuana%20Licensing%20Amendment%20to%20Chapter%2020.pdf (last visited June 15, 2021).

## II. Legal Standard

The Sixth Circuit has stated that

> [i]n general, courts must examine four factors in deciding whether to grant a preliminary injunction: (1) whether the movant has demonstrated a substantial likelihood of success on the merits, (2) whether the movant will suffer irreparable injury absent injunction, (3) whether a preliminary injunction would cause substantial harm to others, and (4) whether the public interest will be served by an injunction. These factors are not prerequisites, but are factors that are to be balanced against each other.

*Flight Options, LLC v. Int'l Bhd. of Teamsters, Loc. 1108*, 863 F.3d 529, 539-40 (6th Cir. 2017) (citation omitted). Further,

> [t]he proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion because a preliminary injunction is an extraordinary remedy. The party seeking the preliminary injunction bears the burden of justifying such relief . . . .

*McNeilly v. Land*, 684 F.3d 611, 615 (6th Cir. 2012) (internal quotation marks and citation omitted).

## III. Likelihood of Success on the Merits

### A. Equal Protection Claim under the Michigan Constitution

The Michigan Supreme Court has stated that

> the right to engage in business is subject to the state's police powers to enact laws in furtherance of the public health, safety, welfare, and morals. Accordingly, when legislation is challenged on due-process and equal protection grounds because of its interference with economic or business activity, the challenger must establish either that no legitimate public purpose is served by the legislation or that there is no rational relationship between the provisions and a legitimate public purpose. Thus, there is a two-step inquiry: (1) whether there is a legitimate public purpose and, if so, (2) whether there is a rational relationship between the legislation and the public purpose sought to be achieved.

*Murphy-DuBay v. Dep't of Licensing & Regul. Aff.*, 876 N.W.2d 598, 604 (Mich. 2015).

Plaintiff argues that she is likely to succeed on her equal protection challenge because "favor[ing] local merchants" is an illegitimate public purpose. Pl.'s Br. at 13 (citing *Colonial Baking Co. of Grand Rapids v. City of Fremont*, 295 N.W. 608, 610 (Mich. 1941)). Plaintiff contends that the legacy licensing scheme "creates precisely the type of durational residency preference that offends Michigan's Constitution. It facially discriminates against both Michiganders who live outside of Detroit and Michiganders who have lived in Detroit for less than 10 to 15 of the past 30 years." *Id*. at 14. She adds that the Ordinance only serves the illegitimate purpose of "pure economic protectionism." *Id*.

In response, defendant argues that "[b]ecause 'statutes are presumed to be constitutional,' courts reviewing equal protection claims under the Michigan Constitution 'exercise the power to declare a law unconstitutional with extreme caution, and . . . never exercise it where serious doubt exists with regard to [the legal] conflict'" between the statute and the constitution. Def.'s Resp. Br. at 14 (quoting *Phillips v. Mirac, Inc*., 685 N.W.2d 174, 179 (Mich. 2004) (noting that "it is only when invalidity appears so clearly as to leave no room for reasonable doubt that it violates some provision of the Constitution that a court will refuse to sustain its validity")). Defendant further argues that because "[p]laintiff's equal protection challenge does not allege discrimination based on . . . race, national origin, ethnicity, gender, or illegitimacy, . . . the correct standard of review is rational-basis." *Id*. (internal quotation marks omitted). Defendant cites the Michigan Supreme Court decision in *Crego v. Coleman*, 615 N.W.2d 218 (Mich. 2000), to support its argument that

> [u]nder rational-basis review, courts will uphold legislation as long as that legislation is rationally related to a legitimate government purpose. To prevail under this highly deferential standard of review, a challenger must show that the legislation is arbitrary and wholly

7

> unrelated in a rational way to the objective of the statute. . . . Rational-basis review does not test the wisdom, need, or appropriateness of the legislation, or whether the classification is made with mathematical nicety, or even whether it results in some inequity when put into practice. Rather, the statute is presumed constitutional, and the party challenging it bears a heavy burden of rebutting that presumption.

*Id*. at 224 (internal quotation marks and citations omitted).

Defendant contends that the challenged provisions within the City Ordinance bear a rational relationship to a legitimate governmental purpose: "[r]eversing the disproportionate[ly] harmful impact of federal drug policies and enforcement actions," as expressed in the Michigan Regulation and Taxation of Marijuana Act ("MRTMA"). Def.'s Resp. Br. at 1. Defendant states that 42 of the 46 licenses for medical marijuana dispensaries were awarded to applicants who are not City of Detroit residents, and notes that neither the Michigan Medical Marijuana Act (MICH. COMP. LAWS § 333.26421) nor the related City ordinance contains a provision calling for a preference to be given to Detroit legacy applicants. *See id*. at 3-4. Learning from this experience, the City of Detroit structured the recreational marijuana ordinance so as to "assist residents who have been most harmed by the criminalization of marijuana-related conduct and to limit the monopolization of adult-use licenses by those who have not experienced the systemic effects of the War on Drugs, which began in earnest in the 1990s." *Id*. at 4. This is the justification given for reserving at least half of adult use recreational marijuana licenses for Detroit legacy applicants. *See id*. at 5, 12.

Defendant contends that "[t]he number of legacy certifications has no impact on the

number of licenses issued to either pool of applicants" – legacy or non-legacy.[5] *Id*. at 5. Defendant further argues that the Ordinance's prioritization of legacy applicants does not reflect favoritism toward them, but rather was intended to provide this presumably less sophisticated applicant pool additional time to complete the licensure process. *See id.* at 6.

### B. Right to Travel Claim under the Michigan Constitution

As to plaintiff's right to travel claim, she states that

> [t]he right to travel has three components: [1] it protects the right of a citizen of one state to enter and leave another state[,] [2] it protects the right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in the second state[, and] [3] for those travelers who elect to become permanent residents, it protects the right to be treated like other citizens of that state.

Pl.'s Br. at 14-15 (quoting 5 Mich. Civ. Jur. Const. Law § 243). She contends that "[t]he Michigan Constitution protects a state right to intrastate travel comparable to the federal right to interstate travel." *Id*. at 15.

The Sixth Circuit has drawn a distinction between the rights to inter- and intrastate travel under the United States Constitution, with the former triggering strict scrutiny and the latter triggering rational basis review. *See Wardell v. Bd. of Educ. of City Sch. Dist. of City of Cincinnati*, 529 F.2d 625, 628 (6th Cir. 1976). However, the Michigan Court of Appeals has taken the following approach to this distinction:

> Whether we characterize the right to travel as fundamental or as something less than fundamental, there can be no question that the right to travel between states has been acknowledged as a right implicit in the very concept of union. In *Grano v. Ortisi*, 86 Mich.

---

[5] As described in further detail in footnote 4, *supra*, the mandated ratio between legacy and non-legacy applicants is unclear. In any event, non-legacy applicants are deprived of the opportunity to apply for at least half of the available licenses.

> App. 482, 272 N.W.2d 693 (1978), this Court discussed the concept of the right to travel within the context of the United States Constitution, Am. XIV, and the Michigan Constitution of 1963, art. I, § 2. The *Grano* Court made no distinction between the right to freedom of travel on an inter-state and intra-state basis and we see no logical distinction between the right of a person to travel between states (which is protected by the United States Constitution) and the right to travel between locations in the State of Michigan (which we find to be protected by the Michigan Constitution). The problem is identical and the analysis ought to be identical.
>
> Our analysis of the above cases leads us to believe that the right to travel is classified as a fundamental constitutional right and that any statute which imposes a penalty on the exercise of this right must be viewed with strict scrutiny.

*Musto v. Redford Twp.*, 357 N.W.2d 791, 792-93 (Mich. Ct. App. 1984) (citations omitted).  The Michigan Court of Appeals has further noted that

> [s]trict scrutiny applies when the law classifies based on "suspect" factors or when it interferes with a fundamental right. However, residency is not considered a suspect classification . . . . Although the right to travel intrastate is a fundamental right, that right is not affected by laws requiring residency during employment because they are distinguishable from durational residency laws which require residency for a period of time before applying for or obtaining a benefit.

*Akhtar v. Charter Cnty. of Wayne*, No. 233879, 2003 WL 327624, at *2 n.2 (Mich. Ct. App. Feb. 11, 2003).

Plaintiff contends that the Ordinance violates her rights to inter- and intrastate travel by imposing a prolonged waiting period on any applicant who has not lived in the City of Detroit for the requisite length of time.  As to her case specifically, plaintiff argues that she is penalized both for having lived in River Rouge, Michigan, and for having lived out of state.  She cites various cases for the proposition that prolonged residency requirements violate the right to travel by imposing a waiting period on new residents.  *See, e.g.*, *Musto*, 357 N.W.2d at 793 (finding that a one-year

residency requirement for police and fire applicants violated the right to travel); *Barnes v. Bd. of Trustees Mich. Veterans Trust Fund*, 369 F. Supp. 1327, 1334 (W.D. Mich. 1973) (finding "that the classification involved in this case clearly penalizes the right to travel, as it mandates that an otherwise qualified person who has recently traveled must wait five years before he can obtain emergency aid which could be immediately obtained by one who has not recently moved into the state"). *See* Pl.'s Br. at 15-16.

Plaintiff argues that regardless of the standard of review, she is likely to succeed on the merits because the Ordinance lacks a rational relationship to the stated governmental purpose of serving marginalized communities that were disproportionately affected by the War on Drugs. She states that

> Detroit's purported justifications for residency preferences make little sense and amount to nothing more than a flimsy pretense for economic favoritism. Detroit has no rational or logical basis to assert that long-term residency requirements promote social equity, ensure that licensed business are sufficiently "invested" in [the] recreational marijuana industry, or increase compliance with MRTMA.

Pl.'s Br. at 17.

In response, defendant contends that residency requirements do not necessarily trigger strict scrutiny and that the Ordinance passes rational basis review. Defendant cites *Barrow v. City of Detroit Elec. Comm'n*, 836 N.W.2d 498, 508 (Mich. Ct. App. 2013), for its statement that "[c]aselaw since *Grano* compels the conclusion that strict scrutiny does not apply to [durational residency requirements] . . . [because] [r]esidency is . . . not one of the suspect classifications." 836 N.W.2d at 509; *see* Def.'s Resp. Br. at 18. Defendant argues that because the purpose of the challenged Ordinance is to further social equity, not to discourage inter- or intrastate travel, the Court should likewise apply rational basis review.

11

### C. Dormant Commerce Clause Claim under the United States Constitution

The Supreme Court has stated that "[t]he modern law of what has come to be called the dormant Commerce Clause is driven by concern about economic protectionism – that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 337-38 (2008) (internal quotation marks and citation omitted). Further,

> [a] discriminatory law is virtually *per se* invalid . . . and will survive only if it advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives. Absent discrimination for the forbidden purpose, however, the law will be upheld unless the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits.

*Id*. at 338-39 (emphasis in original, internal quotation marks and citations omitted).

The Supreme Court has recently noted that "[d]ormant Commerce Clause restrictions apply only when Congress has not exercised its Commerce Clause power to regulate the matter at issue." *Tenn. Wine & Spirits Retailers Ass'n*, 139 S. Ct. 2449, 2465 (2019). Congress may thus "use its powers under the Commerce Clause to [confer] upon States an ability to restrict the flow of interstate commerce that they would not otherwise enjoy." *New England Power Co. v. New Hampshire*, 455 U.S. 331, 340 (1983) (internal quotation marks and citation omitted). However, the party asserting that Congress has exercised this power under the Commerce Clause bears the burden of demonstrating that Congress's intent to allow otherwise discriminatory state regulation is "unmistakably clear." *Maine v. Taylor*, 477 U.S. 131, 139 (1986).

Plaintiff contends that the Ordinance is facially discriminatory and is thus "'virtually per se invalid' unless the City can show that it advances a legitimate local purpose that cannot be adequately served by reasonably nondiscriminatory alternatives." Pl.'s Br. at 20. Plaintiff argues

that, as discussed above, defendant cannot make such a showing. Plaintiff adds that a recent decision from the District of Maine speaks directly to the issues presented in the instant motion. *See NPG, LLC v. City of Portland*, No. 20-CV-00208, 2020 WL 47419 (D. Me. Aug. 14, 2020). *NPG* involved a challenge to Portland, Maine's recreational marijuana licensure ordinance, which included a preference for applicants who have lived in the city, and/or held business licenses in the state, for at least five years. *See id.* at *1. The court in *NPG* granted plaintiffs' motion for a preliminary injunction, finding that the challenged provisions in the ordinance only served protectionist ends and were, therefore, likely unconstitutional. *See id.* at *11. Plaintiff notes that Detroit's Ordinance contains terms that are even more protectionist than those in the Portland ordinance, as it prioritizes Detroit residents who have lived in the City for at least 10-15 years. *See* Pl.'s Br. at 21.

In response, defendant contends that plaintiff is unlikely to succeed on the merits because "there is simply no interstate market for marijuana." Def.'s Resp. Br. at 1. In support of this argument, defendant cites the fact that states bordering Michigan (i.e., Ohio, Indiana, and Wisconsin) have yet to decriminalize recreational marijuana. *See id*. Defendant further argues that by continuing to ban marijuana at the federal level under the Controlled Substances Act of 1970, Congress is using its Commerce Clause powers to confer upon states an ability to restrict the flow of marijuana that they would not otherwise enjoy. *See id*. at 8-9. In defendant's view, marijuana therefore does not benefit from the protection of the dormant Commerce Clause. *See id*. Defendant adds that "[t]he City's social-equity goals are fundamentally different from the sort of pure economic protectionism the dormant Commerce Clause seeks to curtail." *Id*. at 12.

**IV.    Remaining Preliminary Injunction Factors**

As to the remaining factors that the Court must consider when deciding whether to grant a motion for preliminary injunction, plaintiff argues that she will suffer irreparable harm by being excluded from the recreational marijuana market and that "there is likely no mechanism that would allow her to recover damages from the City given its governmental immunity." Pl.'s Br. at 23-24. She adds that the City of Detroit would not be harmed by being prevented from enforcing an unconstitutional ordinance, nor is the public interest served by proceeding with a likely unconstitutional ordinance – regardless of who ultimately prevails on the merits. *Id*. at 24.

In response, defendant contends that plaintiff fails to show how the Ordinance violates her constitutional rights and only speculates that she has been, or may be, denied an opportunity to compete for a license. Def.'s Resp. Br. at 20. Defendant adds that any sense of urgency is of the plaintiff's own making, as she could have filed this lawsuit earlier. *See id*. at 21. In contrast, defendant argues, the City and its social equity agenda would experience significant harm if enjoined from administering the Ordinance.

The Legacy Advocates, a mix of twelve entities and individuals "with substantial expertise [on] the roles and responsibilities required in the cannabis industry and the cannabis market," filed an amicus brief providing further information on the economic harm that might befall legacy applicants and their financial support networks if the Court were to grant plaintiff's motion for a preliminary injunction. *See* Amicus Br. at 6, 16 (citing Amicus Ex. A (Legacy Advocates Affidavits)). Some of these individuals have already invested between $50,000 to $200,000 in recreational marijuana projects or businesses in the City of Detroit and therefore could face significant financial loss if not awarded a license. *See id.*

V. **Conclusion**

Having read the briefs submitted by the parties and the amici, reviewed the relevant case law, and listened to oral argument, the Court concludes that a preliminary injunction is warranted in this case. First, plaintiff has demonstrated a substantial likelihood that the challenged provisions of the Detroit Ordinance unconstitutionally discriminate against all applicants who have not lived in Detroit for at least 10-15 of the past 30 years, violate the fundamental right to inter- and intrastate travel, and impede interstate commerce. At a minimum, the Ordinance must pass rational basis review to be deemed constitutional under both the United States and Michigan constitutions. However, the challenged provisions of the Detroit Ordinance do not appear to be rationally related to the stated purpose of rectifying the harm done to City residents by the War on Drugs. As plaintiff convincingly states in her brief:

> If the City were truly worried about equity, the Ordinance would target the individuals who need social equity treatment . . . . But instead, the Ordinance employs a class-based distinction based on duration of residency. It thus prefers wealthy applicants who have had no interaction with the War on Drugs to low-income applicants who have been ravaged by it, so long as the wealthy applicants have lived in Detroit for the right amount of time.

Pl.'s Br. at 17. As presently drafted, the Ordinance is far more protectionist than it is equitable.

Moreover, the Michigan Court of Appeals has repeatedly indicated that "durational residency laws which require residency for a period of time before applying for or obtaining a benefit" generally trigger strict scrutiny under the Michigan Constitution, as they violate the fundamental right to inter- and intrastate travel, and are generally disfavored.[6] *Akhtar*, 2003 WL

---

[6] There are exceptions to this general rule against durational residency requirements (e.g., for those seeking elective officials, for those filing for divorce, and for students seeking to pay in-state tuition). However, unlike the Ordinance's 10-15-year residency requirement to obtain a business license, these exceptions are generally short in length (approximately one year) and relate to benefits or privileges that are different from those at issue in this case. *See Barrow*, 836 N.W.2d at 509 (noting that the Detroit City Charter's one-year residency requirement to run for mayor "was meant

327624, at *2 n.2; *see also Barrow*, 836 N.W.2d at 511 (holding that durational residency requirements could trigger strict scrutiny if they infringe upon a fundamental right, like "the constitutionally based right to travel"). While there is no right to obtain a business license in the State of Michigan, there is a right to be considered for such a license "in a fair, reasonable and nondiscriminatory manner." *Musto*, 357 N.W.2d at 793. Given the Court's conclusion that plaintiff is likely to succeed on the merits under rational basis review, plaintiff's likelihood of success under strict scrutiny is even greater.

As to plaintiff's dormant Commerce Clause claim, the court in *NPG* addressed substantially similar constitutional arguments as the ones presently before this Court and concluded that a preliminary injunction was warranted. The recreational marijuana ordinance at issue in *NPG* proposed to award licenses using a points matrix that reserved up to nine of the available thirty-four points for those who resided in Portland, and/or held a business license in the State of Maine, for at least five years.[7] In granting plaintiffs' motion for a preliminary injunction, the court stated:

---

to make[ ] it more likely that elected officials will be intimately familiar with the unique issues impacting their communities"). *See also Saenz v. Roe*, 526 U.S. 489, 505 (1999) (distinguishing unconstitutional residency requirements (here, welfare) from those applicable to divorce or in-state tuition by highlighting the fact that the benefits gained from divorce or in-state tuition are enjoyed once individuals leave the state and may encourage non-residents to establish residency for the sole purpose of obtaining such benefits). Defendant cites no cases, and the Court is aware of none, suggesting that the granting of a business license may be conditioned on the applicant meeting a residency requirement of 10-15 years.

[7] The matrix awarded five of the available thirty-four points to applicants who were majority owned by "individual(s) who have been a Maine resident for at least five years." *NPG, LLC*, 2020 WL 471913, at *2. Four additional points were awarded to applicants who were "[o]wned by individual(s) who have previously been licensed by the State of Maine or a Maine municipality for non-marijuana related business, with no history of violations or license suspensions or revocations for a minimum of 5 years." *Id*. The twenty applicants with the highest scores would be awarded municipal licenses. *See id*. Notably, the Portland ordinance also awarded six points to applicants who were majority owned "by socially and economically disadvantaged individual(s)." *Id*. However because the social equity provision was not intertwined with the residency-related provisions, unlike

> As is clear from the text of the licensing scheme and the statements by councilmembers, the City sought to create a preference for resident-owned marijuana retail stores. Rather than disputing the discriminatory character of the residency preference factors, the City attempts to argue that the licensing of marijuana retail stores operates in a unique dimension, noting that [m]arijuana has been, and remains, a Schedule I drug under the [Controlled Substances Act].
>
> \* \* \*
>
> . . . . But the [Controlled Substances] Act nowhere says that states may enact laws that give preference to in-state economic interests. In other words, although the Controlled Substances Act criminalizes marijuana, it does not affirmatively grant states the power to burden interstate commerce in a manner which would otherwise not be permissible. . . .
>
> Because . . . the dormant Commerce Clause likely restricts the City's licensing of marijuana retail stores, the burden falls on the City to justify its licensing scheme. State laws that discriminate against interstate commerce face a virtually *per se* rule of invalidity. . . . The City would need to present[] concrete record evidence, and not sweeping assertions or mere speculation, to substantiate . . . claims that the discriminatory aspects of its challenged policy are necessary to achieve its asserted objectives.
>
> . . . . At this stage, given the express language in the [ordinance] and the statements by City officials suggesting a protectionist purpose, . . . the City is unlikely to succeed in justifying the residency preference . . . .

*Id*. at \*9-11 (emphasis in original, internal quotation marks and citations omitted).

Given the similarities between the constitutional questions raised by the Portland and Detroit recreational marijuana ordinances, the Court finds the reasoning expressed and conclusions drawn in *NPG* to be persuasive and applicable to the instant case. The Ordinance's facial favoritism toward Detroit residents of at least 10-15 years embodies precisely the sort of economic

---

in the Detroit Ordinance, the social equity provision was not at issue in *NPG*.

protectionism that the Supreme Court has long prohibited. *See Davis*, 553 U.S. at 337-38 (quoting *New England Co. of Limbach*, 486 U.S. 269, 273-74 (1988)). The City of Detroit thus bears the burden of demonstrating that the Ordinance's discriminatory provisions "advance[] a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives." *Davis*, 553 U.S. at 338. The City has failed to meet this burden.

In particular, defendant has failed to show that its stated goal of assisting those who have been harmed by the War on Drugs is advanced by reserving fifty percent or more of the recreational marijuana licenses for those who have lived in Detroit for at least ten years. Certainly, many people who have lived in Detroit for this period of time, or longer, have not been burdened with a marijuana-related arrest or conviction. And just as certainly, many people who have lived in Detroit for fewer than ten years have been significantly burdened by such an arrest or conviction. Giving "social equity" preference to the former group while denying it to the latter is irrational. It is also irrational to grant the preference to residents of Detroit but deny it to those of other communities, such as neighboring River Rouge, when residents of both cities presumably suffered from the War on Drugs to the same extent.

Finally, plaintiff has demonstrated that she will suffer irreparable injury absent an injunction, as she would, at best, be significantly disadvantaged in applying for a recreational marijuana retail license (assuming fifty percent of the licenses are reserved for legacy applicants) and, at worst, be entirely eliminated from consideration for such a license (if all of the licenses are awarded to legacy applicants). The Legacy Advocates' amicus brief and attached affidavits demonstrate that legacy applicants and their financial support networks may be economically harmed if the Detroit recreational marijuana licensure scheme is enjoined. However, any such economic harm would be the result of these applicants investing money before obtaining a license,

18

which they did at their own risk. Moreover, the public interest is best served by enjoining the enforcement of an ordinance that is likely unconstitutional. Accordingly,

IT IS ORDERED that plaintiff's motion for a preliminary injunction is granted. Defendant is hereby enjoined from processing any applications for recreational marijuana licenses under the current Ordinance.

Dated: June 17, 2021
Detroit, Michigan

s/Bernard A. Friedman
BERNARD A. FRIEDMAN
SENIOR UNITED STATES DISTRICT JUDGE